J-S25018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE ADOPTION OF: P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: P.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 59 MDA 2019 |

Appeal from the Decree Entered December 13, 2018
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  112 Adoptions 2018

BEFORE:  STABILE, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:            **FILED: MAY 21, 2019**

P.H. (Mother) appeals from the decree involuntarily terminating her parental rights to her minor child, P.H. (born October 2006) (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  After careful review, we affirm.

We note that the trial court has accurately summarized the facts and procedural history of this case.  *See* Trial Court Opinion, 2/4/19, at 1-5.  Mother and Child first came to the attention of Cumberland County Children and Youth Services (CYS or the Agency) on March 1, 2016, following Mother's arrest for allegedly threatening to shoot the employee of a local business.  At that time, Mother was uncooperative with responding officers, and there were

_____

[1] By separate decree, the same day, the court voluntarily terminated the parental rights of J.W. (Father).  Father has not appealed the termination of his parental rights and is not a party to this appeal.

concerns regarding her mental health. Child, who was nine years old at the time, was present during the incident. Mother was taken into custody and directed Child not to answer any questions. Following Mother's arrest, Child was placed in a foster home, where she has resided since.

On March 14, 2016, Child was adjudicated dependent. Subsequently, CYF caseworkers discovered that Mother and Child had been living "a nomadic existence," living "mainly in their car and from time to time in a motel." *Id.* at 1-2. Child was not enrolled in school, and Mother refused to provide any information about Child's medical history. As a result, CYS established family service plan goals for Mother to cooperate with an assessment by Alternative Behavior Consultants (ABC) and follow any recommendations, and obtain a mental health evaluation and follow any recommendations. Mother's visitation with Child was to be supervised, with any phone calls between Mother and Child to be monitored.

The court thereafter held periodic permanency review hearings and found Mother's compliance to be moderate, but her visits with Child to be inconsistent because "initially, rather than have the visits supervised, Mother chose not to visit with [C]hild at all." *Id.* at 2. In December 2016, CYS filed a petition seeking to change Child's permanency goal to adoption. The trial court denied the petition in order to give Mother more time to work toward reunification. In October 2017, Mother gave birth to a second daughter, also with the initials P.H. P.H. was adjudicated dependent, but remained in Mother's care with services provided by CYS. Additionally, Mother completed

a comprehensive mental health evaluation, which indicated that Mother's "most likely clinical diagnosis . . . is a Paranoid Personality Disorder." *Id.* at 4-5.

At the May 25, 2018 permanency review hearing, Child expressed a desire to return to Mother, but also stated that reunification might not be "the best idea" and that finality was more important to her.[2]  *See* N.T., 5/25/18, at 6.  Child also indicated she would like to be adopted by her foster family. *Id.*  At the conclusion of the hearing, the trial court changed Child's permanency goal to adoption and suspended visitation between Mother and Child.  Mother appealed the permanency goal change, and ultimately this Court affirmed.  *See Interest of P.H.*, No. 1009 MDA 2018 (unpublished memorandum) (Pa. Super. Jan. 24, 2019).

On October 5, 2018, CYS filed petitions seeking to involuntarily terminate the parental rights of both Mother and Father.  On December 11, 2018, the petition was modified as to Father because Father was voluntarily relinquishing his parental rights.  On December 13, 2018, the court held a hearing on the termination petitions.  Child was represented by a guardian *ad litem* and by legal counsel.[3]  Kristin Holdaway, Child's counselor; Gan Fry, CYS

---

[2] The notes of testimony from the permanency review hearing were admitted as an exhibit during the termination hearing.

[3] This dual representation, as well as Child's legal counsel ensuring that Child's preferences were placed on the record, satisfied the requirement that Child have legal representation in contested termination proceedings.  *See In re L.B.M.*, 161 A.3d 172 (Pa. 2017); *see also In re T.S.*, 192 A.3d 1080, 1092 (Pa. Super. 2018).

caseworker; and K.B., Child's foster mother, testified for CYS. Mother, represented by counsel, testified on her own behalf. Linda Wiser, court appointed special advocate for Child, testified for the guardian *ad litem*.

At the conclusion of the hearing, the court entered a decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother presents the following issues for our review:

> I. Whether the trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Mother's] parental rights under Section 2511(a) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)[?]
>
> II. Whether the trial court abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when it failed to primarily consider [Child's] developmental, physical and emotional needs and welfare, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A. § 2511(b)[?]

Mother's Brief at 4 (unnecessary capitalization and answers omitted).

We review cases involving the termination of parental rights according to the following:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because

- 4 -

the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations omitted).

In addition, the review of the termination of a parent's rights requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the trial court terminated Mother's parental rights under subsections (a)(1), (2), (5), and (8), as well as subsection (b). It analyzed its section (a) finding primarily under section (a)(8). Nevertheless, "w[e] . . . may uphold a decision below if there exists *any* proper basis for the result reached." *See Weber v. Lynch*, 346 A.2d 363, 366 n.6 (Pa. Super. 1975), *affirmed*, 375 A.2d 1278 (Pa. 1977), citing *Hayes v. Wella Corp*., 309 A.2d 817 (Pa. Super. 1973). Further, we have long held that to affirm the termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re*

***B.L.W.,*** 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc)*. Accordingly, we will focus our analysis on subsection (a)(2).

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

- 6 -

*See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

In her first issue, Mother argues that the court erred in terminating her parental rights pursuant to subsection (a)(2). *See* Mother's Brief at 11-12. Mother contends that despite mental health concerns and housing challenges, she kept Child safe and educated her. *Id.* She also emphasizes that she followed the recommendation to undergo cognitive behavioral therapy. *Id.* Mother avers that it was error for the court to dismiss the progress she made, including obtaining stable housing. *Id.* at 12.

The record belies Mother's contentions. Although she is currently attending therapy, Mother did not begin seriously pursuing mental health treatment until after Child's permanency goal was changed to adoption. Additionally, the trial court stressed that despite the fact that Mother was currently attending cognitive behavioral therapy, she still had "a long way to go" before being able to appropriately parent Child. Trial Court Opinion, 2/4/19, at 7-9. The court stated that it was "never in a position to feel that it would be safe to return [Child] to Mother," who "remained guarded and generally uncooperative with the Agency." *Id.* at 7.

In addition to working toward mental health goals, Mother was required to attend an educational parenting service; although she completed an

evaluation, she did not participate further. *See* N.T., 12/7/18, at 16-17. The objective was for Mother to meet Child's daily basic needs, but she did not progress beyond supervised visitation. *Id.* at 17.

Further, and as stated above, Dr. Kasey Shienvold, Psy.D., performed the mental health evaluation of Mother and testified at the permanency review hearing regarding Mother's prognosis. Dr. Shienvold diagnosed Mother with paranoid personality disorder, which is not curable, and cannot be improved with medication. *See* N.T., 5/25/18, at 15-29. While Mother's mental status could improve, it would require motivation and commitment; Dr. Shienvold was guarded in his belief that Mother could achieve long term success. *Id.* at 28-29. Dr. Shienvold also expressed concerns regarding the potential emotional harm to Child if she were returned to Mother and had to be removed again. *Id.* at 26.

The trial court detailed its findings and conclusions as follows:

[Child] had been in placement continuously for thirty-one (31) months at the time the Agency filed its Petition for Involuntary Termination in October of 2018. During those many months, we were never in a position to feel that it would be safe to return her to Mother. While Mother had obtained and maintained stable housing throughout these proceedings, she remained guarded and generally uncooperative with the Agency. [The court's] consistent concerns about her mental health also stood unresolved until we received the testimony of Dr. Shienvold at the May 25, 2018 Permanency Review Hearing. [The court hoped that it] could send [Child] home that day. But in light of Dr. Shienvold's testimony, we still could not reach that level of comfort . . .

[Child] had been homeless and out of school for most of the first nine (9) years of her life. She has spent almost three (3) years in a stable and safe environment since her placement. [The court

was] not willing to remove her from that stable environment without being able to ensure that Mother would maintain her stability. As [the court] stated at the end of the May Permanency Hearing:

> [H]aving the report from Dr. Shienvold and his testimony has made it clear what needs to be done by Mother in order to assure that [Child is] emotionally, as well as physically, safe. That is the recommendation for Mother to participate in cognitive behavioral therapy to address her paranoid personality disorder. [The court is] satisfied that with successful therapy Mother will be able to parent [the baby] and provide her with a stable home. Unfortunately, with regard to [Child], it has taken too long to get to this point, and [C]hild, by her own testimony, needs permanency . . .

Mother's mental health issues inhibited her ability to provide [Child] with an emotionally safe and stable environment. This was the primary driver of [Child's] dependency. Unfortunately, Mother had not addressed her outstanding mental health needs. She partially met that objective, at best, by obtaining a mental health evaluation. However, until recently, she had not moved forward with the recommended treatment. Instead, she bounced from provider to provider in the hope of hearing exactly what she wanted concerning her diagnoses and treatment recommendations.[17] While she is now invested in the cognitive behavioral therapy recommended by Dr. Shienvold, she has a long way to go and remains unable to appropriately parent [Child][18] . . .

> [17] Since March 19, 2018, Mother has been to no less than 5 mental health providers.

> [18] [The court's] major concern with returning [Child] to Mother is Mother's instability because of her mental health issues and the resulting emotional damage that would ensue to [Child] if she were to be placed again. See Testimony of Dr. Shienvold, Permanency Review Hearing, May 25, 2018, at 18:7-19:22.

Trial Court Opinion, 2/4/19, at 7-9 (footnotes in original).

Upon review, we discern no error in the trial court's finding that competent, clear and convincing evidence supported the termination of Mother's parental rights pursuant to Section 2511(a)(2), based upon Mother's continued incapacity – namely, stability and mental health concerns that had not been alleviated by the time of the termination hearing – that resulted in Child being without essential parental care, the cause of which "cannot or will not be remedied." *See Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

Accordingly, we proceed to consider Child's needs and welfare pursuant to subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

***Z.P.***, 994 A.2d at 1121 (quoting ***In re C.S.***, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. ***See In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. ***Id.*** "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citations omitted).

Mother argues that it is not in Child's best interests for Mother's parental rights to be terminated. ***See*** Mother's Brief at 16. Mother contends that Child has consistently expressed a desire to stay with Mother, and that there is a bond between Mother and Child. ***Id.*** at 16-18. Mother claims that, given the history of the case and the progress Mother has made with her mental health, a bonding assessment should have been conducted, and the trial court erred in failing to preserve the unity of the family. ***Id.***

With regard to its subsection (b) analysis, the trial court stated:

[Child] is strongly bonded with Mother, [but it is] a somewhat unhealthy bond. Mother instilled an "us versus the world" mentality in [Child] until the time of Mother's arrest and [Child's] placement. Her mental health issues created an environment in which [Child] was programmed to be scared and untrusting of others. At the time of the termination hearing, [Child] still

- 11 -

continued to struggle with social cues and interactions due to her upbringing under Mother. Interacting with other students at school remained particularly hard for her. She even requested help to learn how to appropriately interact with teachers and other students.

Mother continued to be a toxic influence during [Child's] placement. In fact, she was found to be causing [Child's] behavioral outbursts, which would manifest only after contact between the two.[20] During the lulls in contact between [Child] and Mother, [Child] behaved in her foster home. Since her contact with Mother ceased, [Child] has done nothing less than thrive in that home. She wants to be adopted by her foster parents. She is loved by them and they stand ready to adopt her.

Sadly, even [Child], through her intelligence and maturity, came to realize that she could not continue her life in limbo to wait for Mother to address her mental health needs. She made it very clear to [the court] in May that the uncertainty was no longer bearable and that she *needed* to move on with her life with her foster family . . . As her attorney represented, [Child] evidenced that wish through her requests to not have any contact with Mother . . . Moreover, she is strongly bonded with her foster family. Based on [Child's] own testimony and apparent strength, [the court] found that severing the bond between her and Mother was in [Child's] best interest and that she would be able to overcome the detrimental effects that the severance will have with the love and support of her foster family.[23]

> [20] Mother encouraged [Child] to disrupt her placement by making false accusations against the foster family. This led to an investigation into the family, which was closed as "unfounded[,"] and caused the foster family to reconsider being an adoptive resource. However, the foster family feels that [Child] is part of the family and has chosen to remain as her adoptive resource. She is thriving in their home.
>
> [23] [The court also believes] the expert's testimony that [Child's] bond with her foster family is strong enough to see [Child] through the emotional harm that the severance will cause her . . .

Trial Court Opinion, 2/4/19, at 9-10 (italics and footnotes in original).

The court's assessment is supported by the record. Child testified at the permanency review hearing that she wants "to make a decision. I don't really want to wait any longer. I want it to be adoption or with my mom. I'm tired of waiting . . . I would always go back to my mom first. But if you think that's not the best idea, then I would go with – to adoption." *See* N.T., 5/25/18, at 6-7. Ms. Holdaway testified that although Child would suffer some emotional harm or detriment if the bond were to be severed, Child's bond with her foster parents was strong enough to see her through that pain. *See* N.T., 12/7/18, at 13. Conversely, Dr. Shienvold testified that he was concerned about the emotional harm to Child that would result if she were returned to Mother and then removed again. *See* N.T., 5/25/18, at 26.

The record further indicates that Child's foster parents provide for her emotional, physical, and mental well-bring. *See* N.T., 12/7/18, at 15-17. Since being placed into care, Child's understanding of social cues has improved, she is doing well in school, has been working with a therapist, and is involved in multiple after-school activities. *Id.* at 25-27. Child's foster family is a willing adoptive resource and loves her. *Id.* at 32.

Consistent with the foregoing, we discern no abuse of discretion in the trial court's conclusion that Child's needs and welfare are best served by termination. Accordingly, clear and convincing evidence supports the trial court's termination of Mother's parental rights under Section 2511(a)(2) as well as the Section 2511(b) finding that, although Mother and Child were bonded, the bond was unhealthy, that termination would not cause permanent

- 13 -

harm to the Child, and that adoption would best serve Child's needs and welfare. ***See Z.P.***, 994 A.2d at 1126-27.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/21/2019